**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MALIYA SAYLES-NIXON**<br>**PLAINTIFF,** | § | |
| | § | |
| | § | |
| **V.** | § | **CAUSE NO. 3:25-cv-2051-S-BN** |
| | § | |
| | § | |
| **UNIVERSITY OF TEXAS** | § | |
| **SOUTHWESTERN MEDICAL** | § | |
| **CENTER, ET AL.,** | § | |
| **DEFENDANTS.** | § | |

# PLAINTIFF'S FIRST AMENDED COMPLAINT

## I. Jurisdiction & Venue

**Jurisdiction:** This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983.
**Venue:** Venue is proper in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district.

## II. Parties

**Plaintiff:**
MALIYA SAYLES-NIXON is an individual residing in Winnsboro, Texas. Plaintiff was at all times relevant to this action an employee of Defendant The University of Texas Southwestern Medical Center.

**Defendants:**
**UT Southwestern:** ("UTSW") is a public state institution of higher education and an arm of the State of Texas, operating within Dallas County, Texas. UTSW was Plaintiff's "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b). UTSW has been properly served and appeared through counsel.
**Defendant Carla Green:** DR. CARLA GREEN was at all relevant times employed as a Faculty Member & Laboratory Supervisor at UTSW, and acted as a state actor and decision-maker with supervisory authority over Plaintiff. Dr. Carla Green is sued strictly in her individual capacity under 42 U.S.C. § 1983. Dr. Carla Green has been properly served and appeared through counsel.
**Defendant Haley Smith:** HALEY SMITH was at all relevant times employed in a Human Resources role at UTSW and acted under color of state law as a state actor. Haley Smith is sued strictly in her individual capacity under 42 U.S.C. § 1983. Smith has been properly served and appeared through counsel.

## III. CLAIMS & CAUSES OF ACTION

**COUNT I: Title VII – Retaliation (42 U.S.C. § 2000e-3(a))**

*(Against Defendant UT Southwestern Medical Center)*

**COUNT II: Title VII – Race Discrimination / Disparate Treatment (42 U.S.C. § 2000e-2(a))**

*(Against Defendant UT Southwestern Medical Center)*

**COUNT III: Title VII – Hostile Work Environment Based on Race (42 U.S.C. § 2000e-2(a))**

*(Against Defendant UT Southwestern Medical Center)*

**COUNT IV: 42 U.S.C. § 1983 – Violation of Equal Rights Under 42 U.S.C. § 1983**

*(Against Defendants Dr. Carla Green and Defendant Smith, in their Individual Capacities)*

## IV. STATEMENT OF FACTS

### A. PLANTIFF'S BACKGROUND & LABORATORY INTEGRATION

1. **Previous Experience:** Plaintiff is a highly qualified professional with an extensive scientific background, including prior experience serving as a Laboratory Manager at UT Southwestern. Due to this specialized training, Plaintiff possesses advanced competencies in laboratory methodology and inventory systems in addition to sample preparation, experiment organization, and other scientific research techniques.
2. **Transfer and Its Conditions:** Plaintiff transferred to Defendant Green's laboratory April 17, 2024 seeking higher compensation and professional advancement. Plaintiff entered Defendant Green's laboratory with strong professional credentials and a letter of recommendation from her prior Principal Investigator, demonstrating her qualifications and strong standing. Plaintiff accepted the transfer to Defendant Green's laboratory based on material representations and promises that Plaintiff would be granted research autonomy, including the authority to design, propose, and conduct her own original scientific research projects. Upon transfer, Plaintiff was trained in mouse handling, genotyping, protein purification, and other duties specific to Defendant Green's laboratory.
3. **Workplace Role and Hours:** In May 2024, Plaintiff began employment as a Research Assistant I in the lab led by Defendant Carla Green. During onboarding, Defendant Green presented two standard schedule options: an "early bird" window (arriving between 8:00 AM and 9:00 AM, alongside personnel Tammy, Kriti, Yusra, Lauren, and Crystal) or a "later bird" window (arriving between 10:00 AM and 11:00 AM, alongside Anne and Brandon). Plaintiff communicated an intended schedule of arriving between 8:30 AM and 9:00 AM to align with the early-shift group.

4. **Agreed Research Expectations:** Plaintiff was told that after completing necessary training for primary tasks, Plaintiff would be permitted to conduct those research activities independently.
5. **Compliance & Training:** From the inception of her transfer, Plaintiff actively sought to contribute to the laboratory's research objectives, including the "aging project" and maintained strict adherence to all standard operating procedures ("SOPs").
   Plaintiff completed all necessary training within 2 months of transfer.

## B. CAR PROBLEMS AND FAMILY HARDSHIPS (APRIL 29 - JULY 25, 2024)

**Vehicle Repair Issues:** April 29th of 2024, Plaintiff's sole vehicle suffered total engine failure, then transmission failure July 12, 2024 after the engine replacement. Due to the necessity of relying on rental transportation paid out-of-pocket and public/ride-share transit, Plaintiff's arrival window shifted to later arrivals as a result. Plaintiffs regularly communicated these vehicle issues and delays to Defendant Green.
**Medical Emergencies:** On June 26, 2024, Plaintiff notified Defendant Green in person that two immediate family members (Plaintiff's mother and grandfather) were admitted to the hospital simultaneously. Defendant Green granted permission for Plaintiff to adjust hours and visit family during lunch breaks. Plaintiff's mother suffered a seizure and her late diabetic grandfather was admitted as well due to a bone infection in his toe. Plaintiff often checked on, and spent her lunches with, her late grandfather until his discharge on the 26th of July 2024 due to proximity, and her mother's 3 month ban from driving following her seizure.

## C. SEVERE AND PERVASIVE HOSTILE WORK ENVIRONMENT

### 1. Pre-Notice Discriminatory Conduct and Workplace Hostility

Shortly after integrating into the laboratory, Plaintiff was subjected to an ongoing pattern of racial harassment, disparate treatment, and professional isolation by non-Black laboratory peers, specifically Anne Ojo, Crystal Olivas-Rasmussen, Kriti Pandey, and Lauren Palluth.

**a. Targeted Racial Microaggressions/Stereotyping**

The discriminatory and hostile environment began forming when non-Black laboratory personnel, specifically Lauren and Crystal, engaged in targeted racial stereotyping by playing rap music upon Plaintiff's entry into the laboratory and pointedly soliciting Plaintiff's reaction to provoke a response and establish a racially dismissive dynamic and test Plaintiff's boundaries.

**b. Exclusion from Beneficial Research Training (Anne, Crystal, Kriti, and Lauren)**

Following a meeting with Defendant Green regarding Plaintiff's original research concepts to plan independent research, Plaintiff shared her ideas with laboratory personnel, specifically Crystal and Anne. In response, Crystal and Anne informed Plaintiff of an upcoming experimental training session and explicitly invited her to attend. However, non-Black laboratory personnel—specifically Lauren, Crystal, Anne, and Kriti—engaged in a coordinated effort to exclude Plaintiff from this essential training. Despite inviting Plaintiff and knowing the training

was necessary for her individual progression and project development, these personnel intentionally conducted the session early and departed for the procedures minutes before Plaintiff's communicated arrival, intentionally depriving her of critical skill development. Kriti and Lauren came into the break room where Plaintiff was eating her lunch, and asked how much time she had left. Plaintiff stated that she had just started her lunch, but would finish soon. Kriti and Lauren then left the break room. Plaintiff felt uneasy about the encounter and quickly finished her lunch only to see that her peers had already left. Tammy, another member of the lab, told Plaintiff the other members had left maybe a minute before she had finished her lunch. Upon their return Crystal spoke in detail about how she felt about euthanizing a mouse (though she did not have clearance to handle mice, nor euthanize mice). When Plaintiff expressed reasonable frustration regarding her deliberate exclusion from the instructional session, lab personnel responded with immediate verbal hostility and mockery. Specifically, lab member Anne Ojo told Plaintiff to 'shut the fuck up,' while surrounding peers openly laughed at and ridiculed Plaintiff, furthering a hostile and isolating workplace environment .

**c. Hazing Incident in Defendant Green's Laboratory (Anne Ojo)**

Shortly thereafter, lab member Anne attempted to coerce Plaintiff into performing a cardiac perfusion/fixation procedure—a surgical process involving anesthesia, the securing and dissecting or the live specimen medially, and injection of fixative directly into the pumping heart of said specimen—for which Plaintiff had not received proper training nor was this needed for her future experiments. When Plaintiff refused to perform this unapproved and unnecessary procedure, lab personnel weaponized Plaintiff's reasonable refusal, mischaracterizing it as uncooperativeness to further isolate Plaintiff and justify heightened scrutiny.

**d. Sabotage of Protein Purification Product (Dr. Crystal Olivas-Rasmussen)**

Later, Plaintiff successfully executed a protein purification protocol for Dr. Olivas-Rasmussen, achieving an exceptionally high purity of approximately 96% on her first attempt. Rather than preserving or properly using this work product, Crystal subjected Plaintiff's high-purity sample to an unapproved "experimental protocol" causing the entire sample to be destroyed and lost within the ÄKTA chromatography system. This interference destroyed Plaintiff's tangible research output and forced Plaintiff to spend over a week duplicating the labor-intensive purification process, further demonstrating a deliberate pattern by laboratory personnel to sabotage Plaintiff's research progress.

**e. Targeted Racial Provocation via Thinly Veiled Slur Homophones (Crystal Olivas-Rasmussen & Lauren Palluth)**

Dr. Crystal Olivas-Rasmussen and Lauren Palluth engaged in targeted racial provocation by repeatedly and ostentatiously chanting the Danish word 'ikke' / 'nikke'—which phonetically mimics a severe racial slur—in the laboratory until Plaintiff was forced to put on noise-canceling headphones. By exploiting foreign vocabulary to project phonetically offensive terms, personnel created a hostile, racially charged atmosphere designed to provoke, intimidate, and harass Plaintiff under the guise of plausible deniability.

**f. Reframing Safety Compliance as "Being Uncooperative" (Crystal Olivas-Rasmussen)**

Plaintiff attempted to maintain safe, socially distanced working conditions in an confined animal holding facility by declining to enter the small space with Kriti, who openly refused to comply with workplace health standards by refusing to wear a mask after a COVID diagnosis—Defendant Green maliciously reframed Plaintiff's adherence to safety protocols as "project abandonment." Defendant Green told Plaintiff that Kriti is “above her and Kriti’s individual projects were very important” to Defendant Green, Plaintiff's protein purification training was lower in priority and that Plaintiff was to be “the worker.” Lab peer Yusra who went with Kriti to the confined space unfortunately contracted COVID after this instance and had to go on sick leave.

## 2. Post-Notice Escalation, Retaliation, and Hostile Environment

**a. Attempted Verbal Intimidation (Crystal Olivas-Rasmussen)**

Following Plaintiff’s formal discrimination reports to Defendant Green, the retaliatory hostility inside the laboratory accelerated. Research Scientist Dr. Crystal Olivas-Rasmussen, aggressively confronted Plaintiff regarding her protected activity of notifying Defendant Green about the conduct within the laboratory. Following a standard, group laboratory meeting, Dr. Olivas-Rasmussen tensely asked to speak with Plaintiff outside the Laboratory.
Dr. Olivas-Rasmussen stated that Defendant Green had told her that Plaintiff had “called her racist.” Dr. Olivas-Rasmussen then attempted an emotional bid by trying to cry; when Plaintiff did not respond, Dr. Olivas-Rasmussen escalated the encounter to aggressive verbal beratement. Dr. Olivas-Rasmussen repeatedly shouted at Plaintiff, calling her a "baby" five or more times in rapid succession, and childishly asserted that Plaintiff's complaint to their Supervisor (Defendant Green) was merely driven by "jealousy" over Olivas-Rasmussen’s personal friendship with peer Lauren Palluth. During this confrontation, Dr. Olivas-Rasmussen stated that Plaintiff should have personally approached her to explain why her conduct was offensive. Plaintiff stated that she was fully confident that Dr. Olivas-Rasmussen, as a thirty-plus-year-old woman and credentialed PhD scientist, fully understood that her conduct was inappropriate and that Plaintiff felt zero obligation to interact with her or explain basic professional boundaries. Plaintiff reiterated that the laboratory was a professional scientific research environment, that her sole focus was conducting scientific research, and summarily terminated the hostile interaction.

This retaliatory, blame-shifting sentiment was explicitly echoed by Defendant Green. On multiple separate subsequent occasions, Defendant Green reprimanded Plaintiff, asserting that Plaintiff should have individually confronted her harassers to explain "how she felt" before escalating the issue administratively. This action by a supervisor–to shift the burden of Title VII (42 U.S.C. § 2000e-2(a)) compliance onto the victim–underscores the institution’s bad-faith refusal to address severe and pervasive racial hostility, treating objective reporting as an interpersonal behavioral failure by Plaintiff rather than an actionable civil rights violation.

**b. Revocation of Protein Purification Training & Duties (Crystal Olivas-Rasmussen)**

In direct retaliation for voicing these boundaries, Dr. Olivas-Rasmussen issued a written directive permanently stripping Plaintiff of core scientific training in protein purification—a vital methodology essential to Plaintiff's research and publication potential. Dr. Olivas-Rasmussen provided a direct, written statement of retaliatory intent, explicitly stating that she was altering Plaintiff's job duties and cutting off her scientific training "because of our conversation last week and the concerns you have expressed."

**c. Sabotage of Genotyping Experiments (Unknown)**

Following Plaintiff's training on laboratory genotyping duties, Plaintiff ran standard gel electrophoresis procedures, which required several hours to complete. On multiple occasions, after setting her gels to run, Plaintiff returned to find that her genotyping samples had been physically tampered with and knocked off course, actively compromising her research results, and requiring multiple hours to redo. This only stopped when Plaintiff set up her phone in order to record the gels running in an effort to catch or deter the sabotager.

**d. Manufactured Failure via Undisclosed Equipment (Anne Ojo)**

Additionally, laboratory peers assigned Plaintiff a protocol requiring sample incubation without disclosing the location of designated equipment. Operating in good faith, Plaintiff used the primary cell culture incubator available in the main workspace. Thereafter, laboratory peers falsely reported to Defendant Green that Plaintiff had intentionally compromised their lab specimen, prompting an unnecessary demand that equipment be autoclaved and that Plaintiff be retrained in cell culturing, despite her transferred mastery and additional Green Lab training. Only *after* reprimanding Plaintiff did lab personnel reveal that a secondary incubator was hidden under a table in the back of the lab, demonstrating a calculated scheme to set Plaintiff up for failure and fabricate grounds for disciplinary action.

**e. Public Demeanment (Anne Ojo)**

Following the incident described above Anne reached out to Plaintiff while she was on her lunch break asking to meet. Plaintiff was unavailable at the time and asked that Anne text or email her the information. Anne declined and insisted that they speak in person. Upon Plaintiffs return to the lab after her lunch Anne loudly confronted Plaintiff in front of the entire lab saying that she needed to be retrained as she had violated the rules, contaminated the incubator, and was not permitted to conduct any cell culture or use the room unless she allowed Anne to retrain her.

**f. Following Plaintiff to Class (Anne Ojo)**

Plaintiff was recommended by Defendant Green to attend lectures conducted by Dr. Yamazaki on campus in order to learn more about metabolism and circadian rhythms as well as to meet the

Professor who would teach Plaintiff Microscopy later. Plaintiff regularly attended these lectures. During one lecture, Anne Ojo interrupted the class and came in to check if Plaintiff was in class then went back to the lab. When asked why she did so Anne stated that she was meeting with a member of another lab named Isara Laothamatas. Plaintiff emailed said individual and was told that they were not at work that day and did not know of any meeting with Anne.

**g. Bad-Faith Reporting of Plaintiff for "Project Abandonment" (Kriti Pandey)**

After being added to the mouse aging project and being promised publication credit, Plaintiff assisted in the set up of the project. The physical aspect of the set up was very laborious. The individuals involved in the set up had to take staggered breaks as it was very hot in the mice's holding facility and full PPE was required. Kriti took on an expedition role, instructing the Takahashi Lab's techs and Plaintiff (a then Research Assistant) where to take the mice in order to complete the set up. After some hours of work Plaintiff and the Takahashi Lab's techs finished setting up and cleaned the mice's environment. Kriti then told Plaintiff she needed to clean up after her as well. Plaintiff declined and returned to the laboratory. Kriti reported Plaintiff for not cleaning up after her and was removed from the project by Defendant Green who stated that Plaintiff "seemed to be confused about what her role was" and accused her of abandoning the project.

**h. Group Harassment/Mobbing Incident (Lauren Palluth & Kriti Pandey)**

After removal from the aging project Plaintiff and Kriti did not go to the mouse facility at the same time anymore but there were no changes to their assigned duties. Kriti had always weighed the mice and Plaintiff weighed their food to track consumption and replenished their water supplies. Plaintiff notified Lauren three times that she would be weighing the mice and replacing their water. Plaintiff completed her portion of the work, cleaned up, and prepped the space for Kriti to use later and notified Kriti that she would need to weigh them when she had time. Kriti did not respond and angrily stared at Plaintiff. Plaintiff told Kriti that she would notify Lauren that she would need to weigh her mice if Kriti did not have time. Kriti quickly walked over to then came back with Lauren, both stood in front of the exit of Plaintiff's bay and Lauren began yelling at Plaintiff to the point that she was red in the face with visible vein protrusion. Plaintiff calmly reminded Lauren that all data she has collected for Lauren has been the differences in the weight of the mice's food. Lauren continued yelling at Plaintiff. Plaintiff stated that Lauren could continue talking and Plaintiff would hear her but would not be responding any further as she was clear in her communication and didn't appreciate being verbally attacked, especially publicly.

**i. Pretextual Schedule Revision Meeting & Removal From Project (Defendant Green & Defendant Smith)**

Following Plaintiff's presentation of discrimination complaints to Defendant Green, Defendant Green dismissed the concerns, gaslighting Plaintiff by claiming she was "overthinking" and "sensitive" due to her grandfather's hospitalization. Shortly thereafter, Defendant Green, while physically out of town, coordinated with Defendant Smith to pull Plaintiff from her research bench without notice for an impromptu meeting via speakerphone. During this call, Defendant

Green revoked Plaintiff's previously approved schedule accommodations—granted due to campus transportation barriers—and instructed Plaintiff to report earlier. When Plaintiff attempted to restate the ongoing hostile environment in the laboratory, Defendant Green abruptly cut her off and ended the conversation.
Immediately following the meeting, Defendant Smith emailed Plaintiff a pretextual email titled "Recap" falsely alleging attendance infractions and project abandonment to construct a paper trail. This communication bypassed standard Human Resources progressive discipline channels; Plaintiff was never issued a formal Performance Improvement Plan (PIP), received no formal written reprimands, and was never asked to sign disciplinary documentation. Plaintiff immediately submitted an exhaustive, line-by-line written rebuttal to Defendant Smith, demonstrating that the accusations were factually false, explicitly challenging the selective, retaliatory surveillance directed by Defendant Green, and notifying her of the change to the Title IX report she made that named Defendant Green as a Reporter.

**j. Disparate Surveillance and Micromanagement (Defendant Green)**

Plaintiff was subjected to an oppressive environment of disparate, selective surveillance. Non-Black laboratory personelle, at the explicit direction of Defendant Green, systematically tracked, logged, and questioned Plaintiff's physical movements and attendance metrics. This hostile micromanagement and tracking was uniquely and disparately applied to Plaintiff , the sole Black employee; non-Black laboratory peers frequently departed the laboratory premises without being subjected to written logs, surveillance, or disciplinary referrals.

**k. Compliance Investigation (Defendant Green & Defendant Smith)**

Toward the conclusion of Plaintiff's employment, Plaintiff was subjected to a surprise compliance interview. While non-Black laboratory personnel were given advance notice, leaving the laboratory entirely empty the morning of the interview. Plaintiff was kept in the dark until her sudden extraction. During the interview, compliance personnel barred Plaintiff from taking any independent notes or recording the session, while forcing her to answer misleading and accusatory questions that echoed accusations by Defendant Smith regarding Plaintiff's conduct. Following this interview, during a private conversation, Defendant Green explicitly admitted the pretextual, retaliatory nature of the university's actions. When Plaintiff stated she merely wished to maintain a strictly professional relationship with her lab mates, Defendant Green rejected the boundary, stating that the laboratory was *"her family and she wouldn't have it any other way"* because she did not have children of her own. Defendant Green aggressively accused Plaintiff of fracturing this dynamic, stating that the entire laboratory staff was upset with Plaintiff because Plaintiff *"reported them to Title IX."* When Plaintiff clarified that she was not the individual who initiated the formal filing, but rather it was Defendant Smith had done so, and that Plaintiff had specifically requested Title IX *not* conduct an active investigation, Defendant Green shifted blame, reprimanding Plaintiff for failing to notify the lab that she did not file the complaint. Defendant Green further confirmed the systemic, disparate surveillance campaign by revealing she possessed a collection of photos secretly taken of Plaintiff by non-Black peers on their personal mobile phones showing Plaintiff texting at her bench. In the same conversation,

Defendant Green hypocritically reprimanded Plaintiff for failing to abandon her research duties in order to sit with those same peers to watch the Olympic Games for two hours. Finally, Defendant Green explicitly attempted to pressure Plaintiff into resigning, stating she did not understand why Plaintiff *"wouldn't leave and go somewhere she was liked and didn't have to set boundaries,"* and explicitly weaponized racial and professional stereotyping by telling Plaintiff that while she was very intelligent, she *"wouldn't go far because she didn't know how to make friends."* Defendant Green concluded by stating that while she allegedly wanted to keep working with Plaintiff, the coordinated, retaliatory *"decision was out of her hands."* This retaliatory motivation was subsequently confirmed via text message. Following this meeting, Plaintiff sent a written inquiry to Defendant Green asking if communicating to the laboratory staff that Plaintiff was not the individual who initiated the Title IX complaint would help de-escalate the hostile environment. Defendant Green responded via text message, validating that the laboratory's hostility was explicitly tied to the protected Title IX activity by stating she did not know, but that it might help if Plaintiff phrased it in a way that signaled a "desire for a better relationship with them."

**3. Plaintiff's Good-Faith Mitigating Efforts and Protected Institutional Disclosures**

a. **Proactive Requests for Duty Clarification:**

In an effort to resolve workplace friction and establish clear boundaries, Plaintiff reached out to Defendant Green on four to five separate occasions, requesting a precise written specification of her daily duties to provide structure, minimize conflict, and foster independent workflow.

b. **Physical Isolation:**

To escape and ease the pervasive tension and hostile environment within the laboratory, Plaintiff was forced to take daily meal breaks exclusively with her grandfather and spend non-active work hours isolating in common areas/hallways after completing her known daily tasks.

c. **Unauthorized Third-Party Title IX Filing De-escalation Request:**

When contacted by Title IX officials, Plaintiff affirmatively sought to de-escalate the matter, requesting that officers refrain from launching a formal investigation and instead handle the situation through informal, constructive management outreach.

d. **Official Confirmation of Protected Disclosures:**

On Monday, July 22, 2024, Compliance Program Manager Sashwata Roy, J.D., formally acknowledged Plaintiff's protected disclosures via email, confirming that based on the compelling evidence provided by Plaintiff, the university had modified its internal file to reclassify Defendant Green as a "Witness" rather than Defendant Smith's suggested status of "Reporter."

## F. INTERFERENCE WITH DUE PROCESSES

Following Plaintiff's pretextual termination, Defendants actively engaged in an intentional campaign of bureaucratic deception, structural conflicts of interest, and procedural obstruction designed to sabotage Plaintiff's administrative appeal rights under Policy EMP-501 (Employee Grievances / Administrative Reviews) and Policy EMP-351P-01 (Appealing Disciplinary Actions).

### 1. Bureaucratic Deception and Severe Conflict-of-Interest Traps

Defendant Smith issued conflicting and false directives regarding the proper official to receive Plaintiff's formal appeal:

a. Defendant Smith explicitly instructed Plaintiff to submit her confidential termination appeal to Department Chair Dr. Joseph Takahashi, despite her termination letter naming Thomas Wang.
b. By directing Plaintiff to Dr. Takahashi, Defendant Smith intentionally attempted to force Plaintiff to submit a sensitive retaliation and racial discrimination complaint directly to the legal spouse of the primary bad actor, Defendant Green. This egregious conflict of interest compromised Plaintiff's confidentiality and demonstrated an absolute, bad-faith institutional effort to shield Defendant Green from compliance protocols.
c. Furthermore, Defendant Smith provided conflicting directives by routing Plaintiff to official Thomas Wang, who subsequently issued a written response confirming he was entirely inappropriate to handle the matter.
d. Defendant Smith likely utilized these fraudulent misrepresentations to run down Plaintiff's strict five (5) working days filing window, intending to construct a fraudulent defense that Plaintiff failed to exhaust administrative remedies, providing further direct evidence of bad-faith institutional retaliation and a violation of Plaintiff's procedural due process rights.

### 2. Bypassing Administrative Obstruction

Despite Defendants' active administrative obstruction and bad-faith misdirection, Plaintiff successfully bypassed these structural traps by asking another Professor who the proper party was and advancing her appeal. Additionally, Senior Employee Relations Consultant Angel De Jesus interjected in the email correspondence with Defendant Smith to notify Plaintiff who to send her complaint to, though this was after the deadline had already elapsed.

### 3. HR Admissions of Structural Defects and Clerical Error

The structural defects of Plaintiff's administrative appeal rights were explicitly confirmed in writing by UT Southwestern's Human Resources department. Late August 2024, Senior Employee Relations Consultant Angel De Jesus issued an official email admitting that the university's formal termination paperwork contained a "clerical error." Consultant De Jesus apologized for the administrative confusion, confirming that the university's own mistakes had corrupted the initial appeal timeline and informed Plaintiff that HR was going to extend the response window for themselves due to their error.

**4. Due Process Data Denial**

In that same administrative disclosure, Consultant De Jesus explicitly blocked Plaintiff from accessing her own relevant employment correspondence and email logs. HR stated that this withholding was an intentional decision meant to "maintain the confidentiality and integrity of the review process." This written record establishes that the Defendant institution systematically isolated Plaintiff from her own evidentiary data while simultaneously demanding that she compile a strict, legally compliant termination appeal. This intentional obstruction made it difficult for Plaintiff to defend herself effectively, providing further conclusive proof of a hostile, retaliatory, and structurally unfair administrative process designed to cement an unlawful termination.

**5. Step One Agency Denial and Failure to Disclose Counter-Arguments**

On September 6, 2024, Vice Provost and Dean for Basic Research, Dr. Joan W. Conaway, Ph.D., issued a final administrative decision refusing to overturn the retaliatory termination. Dr. Conaway explicitly stated her ruling was based on materials provided to her by Senior Employee Relations Consultant Angel De Jesus. Plaintiff replied via email, requesting a copy of the internal response and data provided by HR, pursuant to mandatory university appeal procedures. Defendants failed or refused to provide the documentation, thereby denying Plaintiff the opportunity to see or confront the false allegations used to uphold her termination, violating her constitutional rights to procedural due process under color of state law, and formally concluding the initial Step One process.

**6. Step Two Escalation and Institutional Pretext**

Following the initial Step One administrative hurdles, Plaintiff pursued a Step Two Appeal pursuant to mandatory university policy EMP-351P-01 (Appealing Disciplinary Actions). Following Dean Conaway's denial, the administrative appeal escalated to the highest executive tiers of the institution. In October of 2024, Director of Employee Relations Barvette Garrett issued an official Step Two Appeal Response addressed from Executive Vice President for Business Affairs, Holly Crawford. This document upheld the termination based on a purported investigation conducted by the Office of Institutional Compliance & Audit Services (OICAS), denying Plaintiff's Step Two Appeal.

## G. EXHAUSTION OF INTERNAL ADMINISTRATIVE REMEDIES

Plaintiff has fully exhausted all of the internal administrative procedures provided by UT Southwestern Medical Center, as well as all mandatory statutory prerequisites:

1. **EEOC / Statutory Administrative Charge (August 10, 2024):**

On August 10, 2024, while on administrative leave, Plaintiff filed a formal administrative charge of race discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) / Texas Workforce Commission Civil Rights Division.
Plaintiff has since received her official Notice of Right to Sue from the EEOC.

2. **Formal Termination Executed (August 15, 2024):**

On August 15, 2024, UT Southwestern officially executed Plaintiff's termination.

3. **Step One Administrative Appeal Submission (August 22, 2024):**

On August 22, 2024, despite HR's administrative misdirection and acknowledged "clerical errors" regarding the proper recipient, Plaintiff strictly adhered to policy deadlines and submitted her formal **Step One Termination Appeal** pursuant to Policy EMP-351P-01.

4. **Step One Denial (September 6, 2024):**

On **September 6, 2024**, Vice Provost and Dean for Basic Research, Dr. Joan W. Conaway, Ph.D., issued the Step One administrative denial.

5. **Post-Termination Retaliation Intake Submission & Dismissal (September 9, 2024):**

On **September 9, 2024**, Plaintiff formally submitted a *Retaliation Intake Form* through internal compliance channels to report ongoing post-termination retaliation, procedural misconduct, and racial discrimination.
UT Southwestern subsequently dismissed and closed this intake without conducting an impartial investigation or offering remedial relief.

6. **Step Two Executive Decision & Final Institutional Exhaustion (September 26, 2024):**

Plaintiff escalated her termination to a **Step Two Appeal** under Policy EMP-351P-01.
In early October, Director of Employee Relations Barvette Garrett issued the official Step Two Appeal Response of Executive Vice President for Business Affairs Holly Crawford, formally upholding the termination based on an OICAS investigation that relied on false statements from Defendant Green.
The October 2024 decision constituted the final executive determination by UT Southwestern, officially concluding all available internal university administrative remedies.

TABLE 1. TIMELINE OF KEY EVENTS

| **Event / Action** | **Date** | **Significance** |
|---|---|---|
| Transfer to Green Lab accepted | **04/12/24** | **Baseline Qualifications Established** |
| Engine Failure (arrival time shift) | **04/29/24** | **Legitimate Non-Workplace Barrier** |
| Family Hospitalized (permission granted to visit during breaks/free time) | **06/26/24** | **Approved Accommodation** |
| Notification to Defendant Green about Laboratory conflicts | **07/01/24** | **Protected Activity** |
| Transmission Failure | **07/12/24** | **Legitimate Non-Workplace Barrier** |
| Internal Report of Harassment / Discrimination filed by Defendant Smith | **Early 07/2024** | **Protected Activity** |
| Contact from Title IX & Correction of report | **07/17/24 , 07/22/24** | **Protected Activity / Institutional Notice** |
| Pretextual Meeting to adjust Schedule | **07/24/24 *(estimate)*** | **Adverse Action / Retaliation** |
| Removal from core research duties and key lab responsibilities. | **07/23/24** | **Adverse Action** |
| Notice of Termination issued. | **08/01/24** | **Adverse Action** |
| Step 1 Appeal Denied | **09/26/24** | **Necessary for Exhaustion** |
| Step 2 Appeal Denied | **Early 10/2024** | **Necessary for Exhaustion** |
| Retaliation Case Denied | **09/16/24** | **Exhaustion of Internal Procedures** |

TABLE 2.

FLOWCHART ILLUSTRATING PRIMA FACIE

FOR RETALIATION




TABLE 3.

FLOWCHART ILLUSTRATING PRIMA FACIE

FOR DISCRIMINATION



## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and grant the following relief against Defendants as specified below:

### A. Declaratory and Equitable Non-Monetary Relief

1. A **Declaratory Judgment** stating that Defendant UT Southwestern Medical Center violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, and that Defendants Green and Smith, in their individual capacities, violated Plaintiff's rights under 42 U.S.C. § 1983;
2. An **Order for Expungement** directing Defendant UT Southwestern Medical Center to completely erase and expunge all administrative write-ups, disciplinary records, and negative personnel files generated in connection with Plaintiff's suspension and termination from her official university and employment records;
3. An **Order for Equitable Non-Monetary Relief** directing Defendant UT Southwestern Medical Center to implement an institutional recusal, separation, and academic continuity policy incorporating the following terms:
    a. A mandate to provide a strictly neutral employment and research verification confirming only dates of employment and positions held, with an express prohibition against negative references or input from Dr. Carla Green, Haley Smith, or any personnel affiliated with the termination of Plaintiff's employment;
    b. A formal waiver of conflict of interest regarding Plaintiff's future academic and doctoral program applications within the institution, strictly barring Dr. Carla Green, Haley Smith, and any personnel affiliated with the termination of Plaintiff's employment from serving on, advising, or providing any input to admissions panels reviewing Plaintiff's applications;
    c. A full waiver and institutional coverage of any and all application, processing, or departmental fees for future graduate and doctoral track admissions at Defendant's institution for up to three (3) academic cycles;
    d. An order directing the Graduate School admissions panel to grant Plaintiff an admissions interview upon her initial PhD program application following the completion of her Master's degree;
    e. Guaranteed Institutional Core Facility Access: An Order directing Defendant UT Southwestern Medical Center to grant Plaintiff fully credentialed, non-revocable, and uninterrupted physical and digital access to the university's Core Research Facilities—specifically including neurology, imaging, and molecular core labs—for a minimum period of three (3) years from the date of final judgment or settlement. Such facility access and machine runtime shall be provided at no cost to Plaintiff, or alternatively subsidized via a pre-loaded, non-expiring institutional credit line of a reasonable amount to allow Plaintiff to generate the preliminary data required for future grant applications;
    f. **Preferential Allocation of Surplus and Dissolving Laboratory Assets:** An Order directing Defendant UT Southwestern Medical Center, through its Asset Management or Surplus Property division, to provide Plaintiff with advance written notification of any

laboratory equipment, instrumentation, or scientific consumables decommissioned from dissolving or downsized laboratories prior to such items being released to public liquidation or auction. Defendant shall grant Plaintiff a right of first refusal or "first choice option" to claim functional lab assets. To facilitate this procurement, Defendant shall establish a non-expiring institutional "Surplus Purchasing Credit Tab" of a reasonable amount to cover the processing, release, and standard safety-clearance fees of the selected equipment for relocation to Plaintiff's future independent laboratory space.

**B. Economic Damages (Monetary Relief against Defendant UT Southwestern Medical Center)**

1. An award of **Back Pay**, including all lost wages, stipends, bonuses, health insurance, and university benefits from August 15, 2024, through the date of judgment or settlement, plus pre-judgment interest;

2. An award of **Front Pay** (or financial support in lieu of reinstatement) structured to cover lost earnings, stipends, and educational expenses for a three-year duration.

   a. **Economic Wage Damages & Structured Payment Schedule**

   Plaintiff seeks full recovery for back pay, front pay, pre-judgment interest, and lost benefits caused by her unlawful termination. To avoid the artificial tax inflation of a lump-sum payout, Plaintiff requests that all economic wage recovery be structured in equal installments across three (3) consecutive tax years via one of the following mechanisms:

      1. **Non-Qualified Assignment Annuity (NQA):** Funding a third-party structured settlement annuity to disburse payments over three (3) years; or
      2. **Direct Secured Installments:** Direct university installments over three (3) years, backed by pledged collateral or an escrowed account funded with the full remaining balance.

   b. **Delinquency, Acceleration, & Mandatory Tax Gross-Up:** If any installment is past due by one (1) calendar day, post-judgment interest shall begin accruing immediately at the maximum legal rate. If any installment remains unpaid after fifteen (15) calendar days, Plaintiff shall have the immediate right to foreclose upon the secured collateral and compel the immediate acceleration of the entire remaining balance as a lump sum. If Defendants elect to pay a single lump sum—or if Plaintiff is compelled to litigate or enforce an accelerated lump sum due to Defendants' 15-day delinquency—Defendants shall be ordered to pay a full **Tax Gross-Up** to cover the resulting tax bracket escalation, ensuring Plaintiff nets the exact after-tax economic recovery she would have realized under a three-year structured schedule.

**C. Compensatory and Punitive Damages**

1. An award of **Compensatory Damages** against Defendant UT Southwestern Medical Center pursuant to Title VII (42 U.S.C. § 2000e-2(a)), and against Defendants Green and Smith in their individual capacities pursuant to 42 U.S.C. § 1983, for actual losses, emotional distress, mental anguish, humiliation, loss of reputation, and loss of enjoyment of life, subject to applicable statutory limits;
2. An award of **Punitive Damages** strictly against Defendants Green and Smith in their individual capacities, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial, to punish their willful and malicious prohibition and challenging of Plaintiff's constitutionally protected civil rights and to deter similar future unlawful conduct;

**D. Costs, Fees, and Interest**

1. An award of pre-judgment and post-judgment interest on all monetary sums awarded at the maximum legal rate;
2. An award of reasonable attorney's fees, expert witness fees, and total court costs incurred in bringing this action; and

**E. General Relief**

1. Such other and further legal or equitable relief as the Court deems just, proper, and equitable under the circumstances.

---

## VII. JURY DEMAND

***Plaintiff Maliya Sayles-Nixon hereby demands a trial by jury on all issues and claims so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.***

---

## VIII. SIGNATURE AND CERTIFICATION

Pursuant to Rule 11 of the Federal Rules of Civil Procedure, Plaintiff certifies that to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

1. This First Amended Complaint is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
2. The claims, defenses, and other legal contentions herein are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
3. The factual allegations have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
4. The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Respectfully signed,

**/s/ Maliya Sayles-Nixon**

5015 Addison Circle
1012
Addison, TX 75001
903-424-3799
Email: maliya.nixon@gmail.com
*Plaintiff, Pro Se*